MEMORANDUM OF DECISION
CT Page 4264
This action is for the termination of the parental rights of the biological mother and father of Crystal E. brought by the Department of Children and Families ("DCF"). The biological mother is April E. The biological father is Francisco R. Both parents were served, appeared and represented by counsel throughout these proceedings. Both the mother and father, through their respective counsel, have vigorously contested the petition. The child Crystal E. has been represented by counsel throughout these proceedings as well.
DCF alleges in its petition to terminate the parental rights of the mother and the father, as to each, that (1) the parent has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; General Statutes § 17a-112(c)(3)(D); (2) the child has previously been adjudicated neglected and the parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. General Statutes §17a-112(c)(3)(B); and (3)the child is neglected or uncared for and has been in the custody of the Commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child and the parent has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of the child (Public Act 241, sec. 8(c)(3)(B)(2). It is the burden of DCF to prove its allegations by clear and convincing evidence, and if proven, it must also prove by clear and convincing evidence that it is in the best interest of Crystal to terminate the parental rights of her mother and her father, respectively. The petition to terminate parental rights was filed on August 26, 1998; this, therefore, is the adjudication date. Crystal had been in the custody of the Commissioner for at least fifteen months at the time of the filing of the petition (April 3, 1997-August 26, 1998). Trial of this matter was held on March 15, 17, 19, and 30, CT Page 4265 April 9, 12, and 13, 1999.
Crystal was born on October 5, 1996. From her birth until February 12, 1997 she lived continuously with her mother. During that period of time, she was continuously in her mother's care. On February 13, 1997, Crystal's mother decided to place her in the physical care of her grandparents on a temporary basis at their home. At the time of that decision, DCF was involved with the family on a voluntary basis. Crystal's father was incarcerated. When Crystal was placed with her greatgrandparents she appeared healthy and well-bonded to her mother. She was not observed to have any physical deficiencies or injuries. Crystal lived with her maternal grandparents from February 13, 1997 to April 1, 1997.
In March, 1997 there was a stabbing of an adult by another adult (neither one the parents in this action) in the mother's apartment.
In a conversation with the DCF social worker on April 1, 1997, the mother reported that she was going to her grandparents to bring Crystal back home. The mother requested the DCF social worker to accompany her. The social worker wanted a police escort because there was a restraining order involving the grandparents and the mother in effect at that time. The content of and reasons for that restraining order were never made known to the court. The social worker arranged for the mother to meet her at the police department. As a result of communications with police officers, the case worker then became aware that upon the mother's arrival at the police department, she would be arrested on outstanding warrants. The mother was not made aware of this intended result. The social worker arrived at the police station at the appointed time and left after waiting one-half hour for the mother. She went to the maternal grandparent's home. In the interim, the mother arrived at the police station. She was arrested and held on outstanding warrants. Immediately, DCF invoked a 96 hour hold and removed the child Crystal from her great-grandparents' home she had been living in for approximately six weeks. DCF then sought and received an ex parte Order of Temporary Custody claiming Crystal was homeless because both of her parents were in jail. Crystal was placed in a foster home. Prior to the initial hearing on the Order of Temporary Custody, the mother's grandfather posted her bail to release her from jail. CT Page 4266
Upon removal of Crystal from her great-grandparents' home and her placement in a foster home, the DCF worker noticed a flat spot on the back of Crystal's head. DCF sought no evaluation or treatment of Crystal for this perceived flat spot on the back of her head. No expert evidence was ever presented to the court as to the origin, causes or effects of such a flat spot.
At the initial hearing on April 10, 1997, expectations were issued by the court to the mother[2]. They were to secure and maintain adequate housing and income, go to individual/domestic violence counseling, submit to a hair test for substance abuse, refrain from substance abuse, keep DCF or her attorney informed of her address, keep all appointments set by or with DCF, and have no further involvement with the criminal justice system. The expectations gave notice to the mother that, "[i]f you fulfill the court's expectations, you will improve your chances of regaining or permanently keeping custody of your child. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption."
On August 19, 1997, DCF contemplated filing a termination of parental rights petition as to Crystal's parents. Had they been told it was legally feasible, they would have pursued such a petition at that time.
On September 22, 1997 both the mother and father pled no contest to the neglect charges and Crystal was adjudicated a neglected child and committed to the custody of the Commissioner of DCF for a period not to exceed 12 months. At that time, expectations were again issued, this time to both of the parents. They were far more comprehensive than the April, 1997 expectations. The expectations were: keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney, visit Crystal as often as DCF permits, participate in counseling: parenting, individual/domestic violence, drug/alcohol, sign releases as requested, secure/maintain adequate housing and income, no further substance abuse, no further involvement with criminal justice system and no gang involvement or association with known gang members, and comply with hair test and urine screens. The father was also ordered to contact DCF upon release from prison and inform DCF of whereabouts. The same notice about compliance with expectations as recited above was given to both parents. CT Page 4267
On February 25, 1998, at an Administrative Case Review, DCF first informed the mother that they were considering filing a petition to terminate her parental rights. On May 18, 1998, responsibilities for this family were shifted within DCF from the treatment unit to the permanency planning unit. A new social worker was assigned and she informed the mother that DCF was looking at seeking a termination of her parental rights. In the beginning of June, 1998, DCF formally decided to pursue a termination of the parental rights of the mother and father. In August, 1998, the social worker then involved with the family informed the mother that a termination of parental rights petition was being prepared. As stated earlier, it was filed on August 26, 1998. At virtually all times from the initial court involvement with this family to the time of filing of the petition, and beyond (except a 33 day window in the summer of 1998), the court has continuously determined that rehabilitation efforts were appropriate and ordered DCF to continue with those efforts.[3] On August 14, 1998 virtually the same expectations were reissued to the mother, with the same notice.[4]
Crystal's father was released from prison on or about February, 1998. He had been imprisoned for charges arising out of his stabbing of April E. He was once again incarcerated in April, 1998 for throwing a rock through the windshield of an automobile with April E. inside it. In the interim, he and the mother April E. conceived twins. They were born on October 6, 1998. They were not full term, born at approximately 8 months.[5] Therefore, it can be inferred that the mother was pregnant and carrying twins from sometime in February, 1998 forward until their birth.
The biological father, Francisco R. has spent most of the time of Crystal's life incarcerated. While incarcerated, the terms of his imprisonment have resulted in oniy `no contact' visits with Crystal. The DCF worker understood his status at the prison which resulted in `no contact' visits resulted from him having been a member of the Los Solidos gang and having renounced that gang affilation. No further evidence was presented to the court of his gang affilation present or past. `No contact' visits have the following limitations: the prisoner and the visitor are separated by a wall with a glass window in between. To communicate audibly, a telephone must be used. The tender age of Crystal has resulted in these visits being ineffective for establishing any communication or fostering the development of any bond between her and her father. CT Page 4268
In the brief hiatus when Francisco was out of jail between February and April, 1998 he attended only one of the six possible visits for him with Crystal. The visit that he attended in person with Crystal was on March 11, 1998. He brought an outfit of clothing as a gift for Crystal. The child and he were extremely awkward with each other. This one visit alone was insufficient to melt away the distance and wariness that had become a part of Crystal who had never had the opportunity for a warm and affectionate visit with him because of his imprisonment. He failed to show up for four visits that he had confirmed he would be present for. The other available scheduled visit time was wholly ignored by him.
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Luke G.,40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985); In re Migdalia M., 6 Conn. App. 194, 208-209,504 A.2d 532 (1986). While the biological father expressed an interest in maintaining a relationship with Crystal, he pursued it only when he was incarcerated. No evidence was offered of the presentation of any cards or letters to Crystal from her father. Crystal knows that Francisco is her biological father but she has displayed no attachment to him whatsoever. She has expressed only anxiety, fear and upset at seeing him. Crystal has no feelings for her biological father within the meaning of the statute. As stated by the Appellate Court, "We must conclude, therefore, that the phrase "feelings for the natural parent' refers to feelings of a positive nature." In re Juvenile Appeal (84-6), 2 Conn. App. 705,709, 483 A.2d 1101 (1984).
Upon his return to prison, Crystal became increasingly agitated and unhappy with visiting the jail. His visits with her were monthly. Francisco R. was aware of her unhappiness there, seeing her crying and upset. Some visits he agreed to cutting early. Ultimately, he told the DCF worker that he could see these visits were not good for Crystal and he told the worker that he would not require Crystal to be brought to the prison for visits any longer. The court finds that DCF has proven by clear and convincing evidence that the biological father, Francisco R. has no ongoing parent-child relationship with Crystal, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of Crystal and to allow further time for the establishment of such a parent-child relationship would be CT Page 4269 detrimental to the best interest of Crystal.
In the period that the father was not incarcerated he failed to submit to a urine test although he was referred to a service provider for testing. In the brief time he was out of prison, there was insufficient time for him to engage in parenting classes or counseling, although he signed releases for information for the same. None of these services are available to him in prison.
According to the DCF worker, the next possible release from prison for the biological father was some time in March, 1999. However, during the trial, the father was released from prison. He was free of imprisonment for all of the April trial dates. An initial contact had been made between him and the DCF worker since his release but no services had started up to that point. All of his incarcerations relevant to the time line of Crystal's well-being result from his physical abuse and serious assaults upon Crystal's mother. His little time out of prison was not utilized by him in furtherance of his visitation with Crystal or initiation of necessary counseling. Further in his brief hiatus in between he showed conscious disregard for Crystal's well-being by once again assaulting her mother. Francisco R. has failed to rehabilitate in any fashion whatsoever that this court could find that it is worthy for Crystal to wait longer for him to be ready to assume parenting responsibilities regarding her. The court finds that DCF has proven by clear and convincing evidence that, Crystal being a child having previously been adjudicated neglected, has been in the custody of the Commissioner for at least fifteen months and her biological father, Francisco R. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, given her age and needs, that he could assume a responsible position in her life. Therefore, the court finds by clear and convincing evidence that DCF has proven the allegations of General Statutes sections 17a-112(c)(3)(B)(2) and 17a-112(c)(3) (1). The court notes that these two provisions are however written in the statute in the disjunctive and therefore constitute alternative grounds, both found by the court.
DCF claims that the mother has been noncompliant with most of the expectations issued on September 22, 1997, at the time of the adjudication and disposition of the neglect petition. The mother was required to take a hair test for substance abuse. The appointment had to be rescheduled six times. The reasons were CT Page 4270 varied. None of them were outright refusals. (She showed up too late for one appointment, she had court the date of one appointment, three notices of appointment were not clearly received by her, because they were during a period she moved frequently, discussed supra.) The missed appointments all predate September 22, 1997. By that time she had a hair test, which had been taken on July 29, 1997. The test came back with no results because it was determined an insufficient amount of hair was taken from the mother. The mother was required to submit urine for drug screening. On July 29, 1997 she submitted to a urine screen which came up negative for all substances. The DCF evaluator for alcohol and drug abuse testified that the screens would disclose any consumption of cocaine within the last 48 to 72 hours and marijuana for at least 30 days. The witness did not recall the time line for other substances such as opiates, barbiturates or PCP. The mother complied with the random urine screens requirement, at times through her probation officer. The mother was sentenced on October 3, 1997 to one year in prison, execution suspended, with two years probation. That sentencing was for the offenses she was arrested for when she went to the police station to arrange to pick up Crystal on April 1, 1997. She has had no further involvement with the criminal justice system to the date of the filing of the petition by DCF. On December 31, 1997 she tested positive for marijuana through probation.[6] DCF notes that she also tested positive on December 20. 1997, but it is not clear whether this is the same test as one 11 days earlier. She has had no other positive tests for any other substances. During her subsequent pregnancy, she submitted to random urine screens as requested by her prenatal care giver at Rockville General Hospital. The tests were on August 10 and September 9, 1998. They were both negative for all substances. On September 29, 1998, the mother submitted to a random urine test at the DCF provider, ADRC (Alcohol and Drug Recovery Center). She tested negative for all substances. DCF referred the mother for another hair test on September 9, 1998. She did not appear. On that date she had a prenatal visit at Rockville General Hospital. As referenced above, she tested negative for anything in a random urine taken that date. DCF never referred her for drug/alcohol abuse counseling.
The mother's court ordered expectations included participation in individual and domestic violence counseling. DCF never pursued this with her and never referred her for these counseling services.[7] While the mother was on probation she was in a day incarceration program (DIC). Through DIC she had a CT Page 4271 counselor meet with her and provided her with counseling support. She also completed six weeks of anger management classes for which she received a certificate of completion. The mother was also to participate in parenting counseling as a part of her expectations. DCF provided the mother with a service of parenting classes which she was attending until she was required to attend DIC. DIC would not allow her to attend the DCF parenting classes because they had a parenting class of their own. As to the DCF referred program, the mother did not attend three of the classes prior to her DIC program. She told her DCF worker that she could not finish the classes because she was on an electronic monitoring bracelet issued by DIC. The mother then attended the DIC parenting classes. Upon the mother completing DIC, in March, 1998, the mother made initial arrangements for parenting classes with the same program but did not pursue them.[8]
The mother also had the expectation to visit with Crystal as often as DCF permits. This expectation was not fulfilled by the mother. Her track record for visitation is inconsistent and not good. There are periods up to six weeks that she did not visit at all. Some visits she could not stay the whole session — the reasons were varied, many times leaving early for work. Her inconsistency in the fulfillment of this pivotally important expectation is troubling. An examination, however of the circumstances, paints a far more complex picture than merely the simple answer of an uncaring or inattentive parent. Her DCF worker acknowledged that April had problems with transportation to her visitation. Never did DCF tell the mother that she could ask DCF if they would transport her to and from visitation or provide her with a bus pass. It was the position of DCF that she had to ask for these services first. This is absurd — someone can't ask for a service if they don't know that it is a service that exists. DCF knew she had transportation problems regarding visitation. They did not make reasonable efforts to provide the mother with even the minimal knowledge that there was a service from the Department available to address this dilemma. Undoubtedly, this is not the only reason the mother missed visits. In fact, she acknowledged to Dr. Rodgers that when DCF told her that they were filing a termination of parental rights petition, she thought she was losing her daughter and stopped visiting. This could have been addressed in counseling. This reporting of hers to Dr. Rodgers correlates to her failure to visit from June 29, 1998 through September 14, 1998 (a portion of which time is after the adjudication date). The balance of the stretches of poor visitation attendance are cause for concern. CT Page 4272 However, where DCF has neither made reasonable efforts to facilitate the mother's visitation, nor provided her with counseling which would address parent-child relationship issues, and no evidence is before the court to indicate that these were not significant reasons for nonvisitation, this court cannot conclude by clear and convincing evidence that this is a cornerstone or basis for a finding of failure to rehabilitate by the mother.
Dr. Kelly Rogers, a clinical psychologist, was presented as a witness, by the petitioner, DCF. He had performed a psychological evaluation of the mother, the father, the twins Anthony and Alexander, born October 12, 1998. Crystal was included by the regional juvenile court in this evaluation for purposes of the parent-child evaluation. No individual evaluation was performed of Crystal herself. The dates of the evaluation are November 24 and December 17, 1998.[9] The clinical psychologist, Dr. Kelly Rogers found the father to have an Antisocial Personality Disorder with Narcissistic Features, and evidence of an Impulse Control Disorder, Not Otherwise Specified (NOS). These diagnoses are consistent with the father having the personality characteristics of being selfabsorbed, and having little empathy or understanding of others. He is defensive and manipulative in his approach to the world. The father saw his children only as an extension of himself, not as unique individuals. He has little understanding of children, child rearing or the basic health and care needs of children. In the interviews, the mother had to demonstrate to him how to hold and care for a baby. The entire time he was in the room with Crystal, she was terrified of him and clung to her mother for safety and security. In fact, the child was not able to be at ease to play until he left the room, holding on tightly to her mother the entire time the biological father was present. Crystal was clearly afraid of her father. There was no bond whatsoever observed between the biological father and Crystal. The father's violent history with the mother demonstrates him to be unsafe and a high risk for impulsive violence around Crystal.
The evaluation of the mother April E. resulted in Dr. Rogers finding her to have the characteristics of a Paranoid Personality Disorder with Passive-Aggressive and Narcissistic Features. Her personality traits leading to this diagnosis are that she is distrustful and very sensitive to criticism. She is an impulsive and angry person. She is angry at the way life has treated her. She does not readily give or receive affection spontaneously, CT Page 4273 being very guarded in her relationships.
In the mother's interaction with Crystal she was very able as a parent to provide her the physical and verbal support necessary for a toddler at Crystal's age. She was patient and set limits and redirected Crystal appropriately as necessary. Crystal appeared secure in her mother's grasp and dependent on her mother for security in the face of her fear of her father. She knew April to be her mother and called her Mommy. The mother "maintained a typically close interpersonal space with the children, but she showed little of the spontaneous affection typical of a parent of infants." "Crystal clearly regards [her mother] as a familiar and trusted adult. The dearth of affection betweenthe two is not typical of mother/child relations, and suggests emotional distance."
It is Dr. Rogers' opinion that therapy is necessary to address the mother's personality traits which would put the mother at substantial risk for placing herself first, above her children. The mother shows insight into this, telling Dr. Rogers that she had to give up being a teenager, "doing all the wild stuff." She was in a cycle of having been angry at Crystal's removal and engaging "in marijuana smoking and other [bad] stuff." She acknowledged that she missed a lot of visits with Crystal when all of this was going on and she wants to make up for it now. The longest she had gone with out visiting is 6 or 7 weeks. She described her visits as, "Once every other week for an hour. I didn't go for a while because I thought I was going to lose her. Then the. . . . It's hard for me to make all the visits with the two kids. I was trying to get the visits at home." DCF never offered her counseling to help her through this period, to understand her responsibilities and need to not wallow in self pity.
Dr. Rogers expressed the opinion that the mother's guarded behavior and the children's need for spontaneous physical affection could be addressed and improved if the mother progressed in a course of individual interpersonal therapy.
Adjudication
[T]he United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that `undeniably warrants deference and, absent a powerful countervailing interest, protection..' StanleyCT Page 4274v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551" Inre Jessica M., 217 Conn. 459, 464-15 (1991). "The fundamental liberty interest of natural parents in the care. custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v.Kramer, 455 U.S. 745, 753 (1982).
Because of these fundamental rights, the standard that the petitioner must satisfy before a parent's rights in his/her child can be terminated is proof by clear and convincing evidence of the allegations. "In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing "best interests" standard vitiates the requirement of compliance with the statutory criteria. [citations omitted.]." In re Barbara J., 215 Conn. 31, 45 (1990).
The court finds that the petitioner did not prove by clear and convincing evidence that there is no ongoing relationship between the mother, April, and Crystal. An on-going parent-child relationship is defined as that relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child." General Statutes § 17a-112. The evidence before the court as of the adjudication date, August, 1998, is that there remains a relationship between the mother and Crystal. The child identifies her and knows her to be her mother. The child interacts with her in her supervised visitation. It is noted that the Department only permitted supervised visitation. It is noted that the Department permitted the visits only one time per week and cut them back to only twice per month for an hour as of the end of June, 1998. The Department worker testified that the visitation was cut back because of the infrequency of the mother's visits and the child living further away. The evidence however leads the court to conclude that the visitation was cut back by DCF intentionally to prepare the child for what DCF intended to be the termination of April's parental rights. The distance between CT Page 4275 the foster parents' home and April was not that great. If DCF did not want Crystal to travel often, they could have given April rides to visitation close to Crystal's residence. The visitation was scaled back to coincide with Crystal's adjustment into her pre-adoptive foster home. There was no other reason for that specific date to be picked to scale back visitation.
"When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."Santosky v. Kramer. 455 U.S. 745, 753-754 (1982). Uninterrupted home life "comports . . . with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents. No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breaches in the familial bond will be detrimental to a child's well-being." (Footnotes omitted.) Goldstein, "Medical Care for the Child at Risk: On State Supervision of Parental Autonomy," 86 Yale L.J. 645, 649 (1977). Separation from his or her parents for any significant time has damaging effects on a child, even when the parents are minimally supportive of the child's needs. See Goldstein, Freud and Solnit, Before the Best Interests of the Child, pp. 6-12 (1979); Wald, "State Intervention on Behalf of `Neglected' Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights," 28 Stan. L. Rev. 623 (1976); Goldstein, Freud and Solnit, Beyond the Best Interests of the Child, p. 20 (1973). In Re JuvenileAppeal (83-CD), 189 Conn. 276, 286 footnote 11 (1983).
The court finds that DCF did not use reasonable efforts to reunify Crystal with her mother. As early as August 18, 1997, the DCF decided to pursue the termination of the mother's rights. They did not use reasonable efforts to facilitate visitation; they did not offer counseling.[10]
Based upon the foregoing the court finds that DCF has failed to prove by clear and convincing evidence that April E., the biological mother of Crystal E., has no ongoing parent-child relationship within the meaning of General Statutes § 17a-112(c) (3)(D). The court finds that DCF has failed to prove by clear and convincing evidence that the biological mother has failed to achieve such degree of personal rehabilitation as would CT Page 4276 encourage the belief within a reasonable period of time considering the age and needs of Crystal that her mother could assume a responsible position in her life. General Statutes §17a-112(c)(3)(B).
Required Findings
The following written findings are made in determining whether to terminate parental rights of the biological father, Francisco R. Many of these required findings are made, already, earlier in this opinion. In regard to the biological mother, the court has found, supra, that DCF has failed to meet its burden of proof in regard to either of its alternate ground in seeking to terminate her parental rights. Inevitably, the subject matter of the seven findings have been addressed in this opinion regarding her as well.
(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent.
As to the father, within the time frames of his releases from prison, DCF has made timely provision of services by way of referrals for counseling and drug abuse evaluation. He never utilized them, instead engaging in further criminal conduct which resulted in his reincarceration. Visitation was always offered to him.
Earlier, in this writing, the court has already found that DCF failed to offer the mother individual counseling and failed to inform her that she could seek transportation services for visitation.
(2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
As to the father, the court finds that within the context of his circumstances, DCF made reasonable efforts to reunite him with Crystal. His own criminal conduct and personality flaws were what made reunification not possible.
This court specifically finds that DCF did not make reasonable efforts to reunite the mother with Crystal. From very near the beginning of their involvement with her, they desired to CT Page 4277 terminate her parental rights; not reunify her child with her. They made a conscious choice not to provide her with individual counseling which by its very nature would have been helpful (assuming that she gained benefit from it) to reunification by helping her grow as a person. Instead as she floundered, this service was not provided to her. The worker who was on this matter until June, 1998, testified that it was 2.5 miles each way
from the mother's house to the DCF office. She was aware that the mother had transportation difficulties. She did not offer avenues for help, at all. The visitation was not seen by DCF as a tool or service for reunification, but rather as a test for her."[11]
(3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The court has already detailed the expectations that were court ordered as to both parents and the extent to which the respective parents and DCF have fulfilled these court orders.
(4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As found above, the child has no emotional ties to her father, she is not bonded to him. She knows he is her father. Her only substantial emotional reaction to him is fear and anxiety. No person has exercised care, custody or control of her for one year or more except her former foster mother. The child had positive emotional ties to her. She no longer lives there. The emotional ties to the mother are found and written earlier in this decision.
(5) The age of the child.
Crystal was born October 5, 1996. She is presently 2 years, 5 months old. As of the adjudication date, she was 1 year, 10 months old.
(6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the CT Page 4278 foreseeable future, including, but not limited to:
(A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions. The father missed all but one of his visits when he was not jailed. He sent no cards, gifts or letters to the child when he was incarcerated. He visited when incarcerated until he determined that it was too upsetting for the child. The mother was inconsistent in her visitation. When she visited she brought gifts at times and snacks.
(B) the maintenance of regular contact or communication with the guardian or other custodian of the child. The mother maintained contact most of the time with DCF. She was in contact with the prior foster mother. The father was in contact with DCF when in jail and briefly did so when not in jail.
(7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
As to father, none.
Disposition
Crystal is presently a committed child in the custody of the Commissioner of DCF. Crystal was moved by DCF into a foster home with a family that desires to adopt her. They have a loving relationship with her. The mutual affection between Crystal and these foster parents was well expressed by them in their testimony. They offer her a warm and nurturing home. Coincident with the move of Crystal to this family, DCF cut back the mother's visitation. This combination plus the long period of time since Crystal lived with her mother has created a strain on the bond of Crystal with her mother. Crystal has shown great affection and interest in her two younger siblings that live with her mother. DCF must foster the relationship between Crystal and her mother. The testimony of how DCF helped these new foster parents transition Crystal into being comfortable with them before moving her from her previous foster home was riveting.[12] The commitment described there to making the CT Page 4279 relationship work with the new foster parents stands in stark contrast to DCF's attitude toward the relationship of Crystal with her own mother. Daily contact of Crystal with her mother was never allowed by DCF. Unsupervised contact between Crystal and her mother was never allowed by DCF. This all must occur imminently to foster the relationship between Crystal and her mother. DCF must apply available resources and make available all necessary services toward working with Crystal and her mother for their reunification. Given the age and needs for permanency of Crystal, DCF should not unnecessarily prolong this process. DCF's placement of this child in a second foster home while this petition was pending has exposed her to more transitional readjustment challenges, unfortunately. This may not be in the best interest of Crystal. However, this court does not reach the issue of her best interests, when the grounds for termination have not been proven.
 "It bears emphasis that ajudicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. `Our statutes and case law make it crystal clear that the determination of the child's best interests come into play only after statutory grounds for termination of parental rights has been established by clear and convincing evidence.' (Emphasis in original.) In re Valerie D., 223 Conn. 492, 511, 613 A.2d 748 (1992); In re Jessica M., supra, 466. "[A] parent cannot be displaced because someone else could do a `better job' of raising the child. . . ." Matter of Corey L. v. Martin L. supra 391; In re Jessica M., supra, 467; see comment, "The Two Pronged Inquiry — The Best Alternative for the Conflicting Rights Involved in Proceedings for Termination of Parental Rights, 13 Conn. L. Rev. 709 (1981)." In re Baby Girl B., 224 Conn. 280 (1990).
The father's personality flaws are deeply entrenched. Long term therapy would be needed to address his anger and impulse control problems. His inability to see Crystal as anything more than an extension of himself prevents him from being able to perceive and address her needs. He has been repeatedly abusive toward Crystal's mother. He has no knowledge of parenting responsibilities or the needs of children. He has no meaningful ongoing relationship with Crystal. CT Page 4280
Crystal has been in foster care for much of her life. All of her emotional energies will be focused on readjusting to the circumstances required by these orders, namely reunification with her mother. To prolong her emotional uncertainties as to who her care givers are or will be and to wait the very long time necessary to give her father time to try to establish a meaningful relationship with her and rehabilitate himself is not in her best interest.
These findings are made after considering the child's sense of time, need for a secure and permanent environment, the relationship that she has with the respective foster parents, and the totality of all the circumstances. In re Juvenile Appeal(Anonymous), 177 Conn. 663, 667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests ofthe Child 99 (1979).
Based upon the foregoing, the court finds by clear and convincing evidence that it is in the best interest of Crystal to terminate the parental rights of her biological father. It is ordered that the parental rights of the biological father, Francisco R. in and to Crystal E. are hereby terminated. DCF, the present custodian of Crystal must immediately undertake earnestly and intensely to reunify Crystal with her mother. Only when they have made these efforts will reunification be possible. The mother must avail herself of all needed and court-ordered services while Crystal is in DCF custody and if a court orders her returned to her. Her ability to do so is essential to Crystal's well-being.
MUNRO, J.
[2] Notably, they did not include "visit the child as often as DCF permits."
[3] For about one week there was a court order that reasonable efforts were not appropriate, from July 2, 1998 to August 14, 1998, although a reading of the two court Memorandum of Hearings together suggests that the earlier determination that efforts were no longer appropriate appears to be not be an unequivocal conclusion, or, a scrivener's error because the Memorandum states also, "court wants efforts to be made/Formal Steps Decision on relative placement."
[4] On December 10, 1998, after the filing of the termination CT Page 4281 of parental rights petition regarding Crystal by DCF (and therefore after the date that facts may be considered for adjudication purposes) the regional court issues specific steps to the mother and to DCF. These specific steps regarded Crystal as well as her twin brothers, Alexander and Anthony. The court ordered the mother to comply with the following steps to safely retain or regain custody of the above-[named] children by the [mother]: "[k]eep all appointments set by or with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child's court-appointed attorney and/or guardian ad litem; keep children's whereabouts and your whereabouts known to DCF, your attorney and the attorney for the child(ren); participate in counseling and make progress toward the identified goals: parenting, individual. Treatment goals should include, but are not limited to, the following: to focus on issues to help mother better parent her children; to address issues of anger management; accept and cooperate with in-home support services referred by DCF and make progress toward the identified goals; submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention; submit to random drug testing; time and method of the testing shall be at the discretion of DCF; follow recommendations of service providers, recommended providers: Rockville General Hospital, Family Preservation for home parenting services; sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before this Court; secure and/or maintain adequate housing and legal income; no further substance abuse; no further involvement with the criminal justice system: consistently and timely meet and address the children's physical, educational, medical, or emotional needs, including, but not limited to keeping the children's appointments with their medical, psychological, psychiatric, or educational providers; make all necessary childcare arrangements insuring that the children are adequately supervised and cared for by educational providers; immediately notify DCF of any changes in the composition of the household to ensure that the change does not compromise the health and safety of the children; maintain the children within the State of Connecticut during the duration of this order; and no involvement with known drug users or dealers, or gang members; visit Crystal as often as DCF permits. DCF was ordered to, besides the boilerplate orders, provide mother with a bus pass.
CT Page 4282
[5] The mother delivered the children by Caesarian section. DCF invoked a 96 hour hold on the twins and then sought and received an ex parte Order of Temporary Custody. After a hearing on the order, the order was vacated and the twins were ordered by the court returned to the custody of their mother April E. Those children remain in her care. These facts are post-adjudicative and therefore not considered for those purposes.
[6] As a result of this, her probation was violated in late February or March, 1998. She subsequently pled admitting the violation. Her probation was continued. Since then she has been negative for substance abuse. All those urine screens, however, were subsequent to the filing of the petition: she has had 5 urine screens and all have tested negative for substance abuse. The screens were on October 1, November 12, December 9, 1998 and January 21 and February 4, 1999, all of which are subsequent to the adjudication date.
[7] The current worker has recently referred the mother for individual counseling, which she has commenced. This is all post-adjudication date.
[8] The current worker recommended the mother re-enroll in parenting classes in late August, 1998; the mother was delayed because with the hiatus of the premature delivery of the twins. She has re-enrolled in them as of February 3, 1999, which is after the adjudication date. She has continued with those classes which are 10 weeks in duration.
[9] These are post-adjudication dates. However, the evaluation findings can be used circumstantially, in regard to this petition which was filed 2 — 3 months earlier, to determine what the situation was at the time of the filing of the petition. In re Shannon S., 41 Conn. Sup. 145, 155 (1988).
[10] Post adjudication date, in that time period to date, the mother is attending counseling now that it has been offered to her; she is completing parenting classes; the court has ordered DCF to provide her a bus pass; she is attending her visitation consistently; she has had no further involvement with the criminal justice system and she has had negative urine screens.
[11] The present DCF worker testified that making the mother walk, often with her twins, to visitation in the winter was CT Page 4283 acceptable. She measured the distance to be 1.0 mile each way. As to what the mother should do in a snowstorm, for example, to get to visitation, instead of indicating that the Department would help her, she testified, "We wouldn't hold it against her."
[12] Intimate family meals and very frequent daily contact were highlights of the transition plan utilized by DCF to help Crystal feel comfortable before moving her to her new home.